UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:15-CV-00195-TBR-LLK

ACT FOR HEALTH, d/b/a
Professional Case Management, *et al.*,                    Plaintiffs/Counterclaim Defendants,

v.

UNITED ENERGY WORKERS
HEALTHCARE CORP., *et al.*,                    Defendants/Counterclaimants,

v.

COLD WAR PATRIOTS NON-PROFIT
CORPORATION,                    Counterclaim Defendant.

**MEMORANDUM OPINION AND ORDER**

ACT for Health, doing business as Professional Case Management, along with its wholly-owned subsidiary, Professional Case Management of Kentucky, LLC (collectively, PCM), filed this action against United Energy Workers Healthcare Corp., (UEW), and its wholly-owned subsidiary, Kentucky Energy Workers Healthcare, LLC, (KEW), along with Brightmore Home Care of Kentucky, LLC, ("Brightmore"), John Falls, Travis Shumway, Chad Shumway, and Nicholas Bame. PCM brings claims for unfair competition, for violating Kentucky law regarding the licensure of health care service providers, for tortious interference with contractual and prospective business relationships, and for civil conspiracy. Defendants have filed a motion to dismiss all of PCM's claims against them for failure to state a claim and for lack of personal jurisdiction. [DN 154.] PCM responded, [DN 177], and Defendants replied, [DN 186.] PCM then moved for leave to file a sur-reply, [DN 190], which Defendants oppose, [DN 193.] For the

reasons discussed in detail below, Defendants' motion to dismiss, [DN 154], is **GRANTED**, and PCM's motion to file a sur-reply, [DN 190], is **GRANTED**.[1]

BACKGROUND

This case arises out of a dispute between providers of home-health care services to eligible individuals under the Energy Employees Occupational Illness Compensation Program Act of 2000 (EEOICPA), 42 U.S.C. §§ 7384 to 7385s-16. Administered by the U.S. Department of Labor, the EEOICPA affords "benefits to individuals or their survivors for illnesses incurred from exposure to toxic substances while working for the Department of Energy or certain related entities." *Watson v. Solis*, 693 F.3d 620, 622 (6th Cir. 2012). Under the EEOICPA, eligible individuals may receive health-care services, including home-health care services and personal-care services, from designated providers, whom the Department of Labor reimburses. *See* 42 U.S.C. §§ 7384e, 7384t; 20 C.F.R. §§ 30.400, 30.403.

The Commonwealth of Kentucky regulates providers of home-health care services, known as "home health agencies," and providers of personal-care services, called "personal services agencies," differently. To provide home-health care services under Kentucky law, an entity must first obtain a "certificate of need" from the Cabinet of Health and Family Services to establish a "home health agency." *See* Ky. Rev. Stat. § 216B.061(1)(a); *see also id.* § 216B.015(9), (13). A "home health agency" is, in broad terms, an "organization . . . which provides intermittent health and health related services, to patients in their place of residence, either singly or in combination as required by a plan of treatment prescribed by a licensed physician." 902 Ky. Admin. Reg. 20:081, § 2. "Health services," in turn, means "clinically

---

[1] Ultimately, PCM's sur-reply did not affect the outcome in the case. Therefore, the Court's consideration of the sur-reply did not prejudice Defendants. Accordingly, in the interests of justice, the Court is granting PCM's motion, [DN 190.]

related services provided within the Commonwealth to two . . . or more persons, including but not limited to diagnostic, treatment, or rehabilitative services." Ky. Rev. Stat. § 216B.015(14).

To provide personal-care services, on the other hand, an entity must obtain certification from the Cabinet to operate a "personal services agency." Ky. Rev. Stat. § 216.712(1); *see also* 906 Ky. Admin. Reg. 1:180, § 2. Generally speaking, a "personal services agency" is an organization "that directly provides or makes provision for personal services." Ky. Rev. Stat. § 216.710(8). "Personal services," in turn, include:

> [a]ssisting with a client's ambulation and activities of daily living as defined in KRS 194A.700; . . . [f]acilitating the self-administration of medications if such medications are prepared or directed by a licensed health-care professional or the client's designated representative; . . . [p]roviding services which may be referred to as attendant care, in-home companion, sitter and respite care services, and homemaker services when provided in conjunction with other personal services; and . . . [p]roviding services that enable the client to live safely, comfortably, and independently.

*Id.* § 216.710(7)(a). The definition explicitly excludes, among other things, services that "require the order of a licensed health-care professional to be lawfully performed in Kentucky," *id.* § 216.710(7)(b)(6), as well as any "health-care entity or health-care practitioner otherwise licensed, certified, or regulated by local, state, or federal statutes or regulations," *id.* § 216.710(7)(b)(9).

ACT for Health, doing business as Professional Case Management, furnishes home-health care services to EEOICPA-eligible patients in Kentucky through its wholly-owned subsidiary, Professional Case Management of Kentucky, LLC. [DN 148 at 5, ¶¶ 21–22 (First Amended Complaint).] PCMK is a licensed "home health agency" under Ky. Rev. Stat. § 216B.105(1). [*See* DN 57-2 at 3 (Home Health Agency License).] United Energy Workers Healthcare Corp., through its wholly-owned subsidiary, Kentucky Energy Workers Healthcare, LLC, also furnishes home-health care services to EEOICPA-eligible patients in Kentucky.

PCM alleges that UEW and KEW have been providing home-health care services without the necessary licensure required for a "home health agency." [*See* DN 148 at 6–7, ¶¶ 28–30.] Further, according to PCM, "KEW and UEW have solicited or attempted to solicit PCM's patient-clients" and have "offered incentives as a way to induce patients to choose KEW or UEW and/or to switch from PCM, such as offering free, unrelated services (e.g., free lawn care or other services or items)," which PCM contends violates the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b). [*Id.* at 7, ¶¶ 31–33.] PCM further alleges that KEW and UEW have acted unlawfully by improperly advertising jobs for home health nurses as independent contractors rather than employees, which gives them "an unfair advantage in the market." [*Id.* at 7, ¶¶ 34–36.]

In support of its proposition that KEW and UEW are operating unlawfully, PCM asserts that, "[d]uring the pendency of this litigation, the Kentucky Office of Inspector General ("OIG") investigated UEW's provision of services in Kentucky, and determined in August 2016 that UEW had exceeded the scope of its Personal Services Agency certification in connection with six out of six patients sampled by OIG." [*Id.* at 8, ¶ 37.] Additionally, in its First Amended Complaint, PCM adds Brightmore as a Defendant, claiming that Mr. Falls and the Shumways formed Brightmore in August 2016, after this litigation began, "apparently with the intent to purchase Private Duty Nursing Agency licenses held by other entities." [*Id.* at 8, ¶ 38.]

PCM alleges that, "after its formation, Brightmore began providing home health care services to UEW's and/or KEW's clients, in conjunction with UEW and/or KEW." [*Id.* at 8, ¶ 40.] PCM further alleges that, "[u]pon information and belief, Brightmore is not a licensed home health agency, as that term is defined under Kentucky law and, therefore, its provision of home health care services is unauthorized," and therefore contends that "any liability resulting from the

unauthorized provision of home health care services by Brightmore is attributable to UEW and/or KEW, and vice versa." [*Id.* at 9, ¶¶ 49, 51.] In essence, PCM believes that "one or more of the Defendants formed Brightmore for the express purpose of hiding and/or limiting UEW's and/or KEW's liability in this litigation." [*Id.* at 10, ¶ 53.]

PCM brings claims against UEW, KEW, and Brightmore for unfair competition and for violating Chapter 216B of the Kentucky Revised Statutes, which governs the licensure of health care service providers. [*Id.* at 11–13.] Against all Defendants, including UEW, KEW, Brightmore, and the Individual Defendants (John Falls, Travis Shumway, Chad Shumway, and Nicholas Bame), PCM brings claims of tortious interference with contractual and prospective business relationships and civil conspiracy.

After PCM filed its First Amended Complaint, [DN 148], Defendants filed the instant motion to dismiss, asserting that each of the four claims in PCM's complaint fail to state a claim upon which relief can be granted. [*See* DN 154 (Motion to Dismiss); DN 155 (Memorandum in Support of Motion to Dismiss).] Additionally, Defendants argue that this Court does not have personal jurisdiction over the Individual Defendants, and therefore that they must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2). [DN 154; DN 155.]

STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss under Rule 12(b)(6), a party must "plead enough 'factual matter' to raise a 'plausible' inference of wrongdoing." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). When considering a Rule 12(b)(6) motion to dismiss, the court must presume all of the factual allegations in the complaint are true and draw all reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Great Lakes Steel v. Deggendorf*, 716 F.2d 1101, 1105 (6th Cir. 1983)). "The court need not, however, accept unwarranted factual inferences." *Id.* (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). Should the well-pleaded facts support no "more than the mere possibility of misconduct," then dismissal is warranted. *Iqbal*, 556 U.S at 679. The Court may grant a motion to dismiss "only if, after drawing all reasonable inferences from the allegations in the complaint in favor of the plaintiff, the complaint still fails to allege a plausible theory of relief." *Garceau v. City of Flint*, 572 F. App'x. 369, 371 (6th Cir. 2014) (citing *Iqbal*, 556 U.S. at 677–79).

## DISCUSSION

Defendants move for the dismissal of each of PCM's claims against them. [DN 155 at 6.] The Court will address each of PCM's claims in turn.

### A. Unfair Competition

Defendants first move to dismiss PCM's claim of unfair competition on the grounds that PCM has failed to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

While a common-law action for unfair competition has long been recognized in the Commonwealth, and elsewhere, its boundaries under Kentucky law are somewhat unclear. The essence of the tort "is the bad-faith misappropriation of the labors and expenditures of another likely to cause confusion or to deceive purchasers as to the source or origin of goods." *Kenney v.*

*Hanger Prosthetics & Orthotics, Inc.*, 269 S.W.3d 866, 871 (Ky. Ct. App. 2007) (quoting 54A

Am. Jur. 2d *Monopolies, Restraints of Trade, and Unfair Trade Practices* § 1107 (1996)).

According to Kentucky's highest court, unfair competition under Kentucky law

> consists of either (1) injuring the plaintiff by taking his business or impairing his
> good will, or (2) unfairly profiting by the use of the plaintiff's name, or a similar
> one, in exploiting his good will. Underlying the whole theory is the matter of
> actual or intended deception of the public for business reasons.

*Covington Inn Corp. v. White Horse Tavern, Inc.*, 445 S.W.2d 135, 139 (Ky. 1969).

In their motion to dismiss, Defendants argue that PCM's allegations that "UEW does not

have proper licensure and has misclassified caregivers as independent contractors, resulting in

cost savings that give UEW an unfair advantage in the marketplace," even when accepted as

true, "fail to state a claim under Kentucky law because PCM makes no claim that UEW tried to

confuse potential customers or otherwise capitalize on PCM's goodwill." [DN 155 at 11.]

PCM argues, on the other hand, that "Defendants define Kentucky unfair competition

claims far too narrowly." [DN 177 at 7.] In support of this argument, PCM relies on a portion of

*Covington Inn Corp. v. White Horse Tavern, Inc.*, in which Kentucky's highest court (then the

Court of Appeals) cited a treatise, American Jurisprudence on Trademarks, to explain the

evolution of the doctrine of unfair competition:

> 'As stated by some authorities, the essence of the wrong is the sale of one's own
> goods for those of another person, and it has sometimes been declared that
> nothing less than conduct tending to pass or 'palm' off one's own merchandise,
> services, or business as that or those of another will constitute unfair competition.
> According to other authorities, however, the doctrine of unfair competition is not
> limited to such passing off of one's goods, services, or business for those or that
> of another, but extends to others acts done or practices employed for the purpose
> of pirating the trade of a competitor. It has been held to apply to misappropriation
> as well as misrepresentation, to the selling of another's goods as one's own—to
> misappropriation [sic] of what equitably belongs to a competitor. Also, the
> doctrine has been extended in many cases, especially the more recent, so as to
> afford protection and relief against the unjust appropriation of, or injury to, the

good will or business reputation of another, even though he is not a competitor.'
(Emphasis added.)

*Covington*, 445 S.W.2d at 137–38. PCM construes portions of the above-excerpt from *Covington* to mean that unfair competition law in Kentucky has a broad reach beyond the trademark context. [*See* DN 177 at 9.] The way PCM sees it, its allegations "that UEW (which includes Defendant Kentucky Energy Workers Healthcare) and Brightmore provide unlicensed home health care in Kentucky, which has unfairly injured PCM by taking its business and/or impairing its good will" are more than sufficient to state a claim for unfair competition under Kentucky law. [*Id.* at 9.] PCM further argues that it states a claim for unfair competition through the allegations that "UEW is . . . misclassifying its employees as contractors, which gives it an unfair advantage in recruiting workers and unlawfully increases its profit margins" and that "UEW's and Brightmore's actions are deceptive, because UEW and Brightmore surely are not notifying their patients that they are operating unlawfully, without appropriate licensure or authority." [DN 177 at 10 (citing First Amended Complaint).] In essence, PCM alleges "that UEW injured PCM by taking PCM's business." [*Id.*]; *see Covington*, 445 S.W.2d at 139 ("[U]nfair competition consists [in part] of . . . injuring the plaintiff by taking his business or impairing his good will.").

The Court disagrees that the tort of unfair competition extends to PCM's allegations in this suit. PCM's unfair competition claim, in essence, consists of allegations that UEW's provision of home-health care services without the required licensure, along with its misclassification of employees, gives UEW an unfair advantage in the marketplace. [*See* DN 148 at 7, ¶¶ 29–36.] Even if PCM's allegations are true, however, they do not support an actionable claim for unfair competition under Kentucky law. All of the cases discussed by the *Covington* in articulating "its definition of unfair competition involved one party alleging that another party was using a similar name with the intent to deceive the public." *Raheel Foods, LLC v. Yum!*

*Brands, Inc.*, No. 3:16-CV-00451-GNS, 2017 WL 217751, at *7 (W.D. Ky. Jan. 18, 2017)

(discussing *Covington*, 445 S.W.2d at 138–39). Indeed, in *Covington*, the court noted that "[t]he

classic case" of unfair competition "is when the defendant uses a name or symbol to identify

products [or services] for the obvious purpose of capitalizing on the good will created by a

competitor in the same line of business." *Covington*, 445 S.W.2d at 138. For example, the

*Covington* court explained that,

> [i]n Louisville Taxicab & Transfer Co., v. Yellow Cab T. Co., D.C., 53 F.Supp.
> 272, the plaintiff claimed a property right in the name 'Yellow Cab'. The
> defendant was a foreign corporation by the name of 'Yellow Cab Transit
> Company'. It operated only as a common carrier of freight but it solicited
> business in Louisville as the 'Yellow Transit Company'. The plaintiff was given
> injunctive relief basically on the ground that the defendant was capitalizing on the
> plaintiff's good will.

*Id.* The Court also cited an analogous Kentucky case, *Kay Jewelry Co. v. Gay's Jewelry, Inc.*,

277 S.W.2d 30 (Ky. 1955), in which

> Kay Jewelry Company had operated a store on Fourth Street in the City of
> Louisville since 1931. In 1952 GAY'S JEWELRY, INC., opened the same sort of
> business in a store about four blocks away on the same street. We affirmed a
> judgment of the Chancellor refusing to grant KAY an injunction. In reaching this
> conclusion it was said (page 33 of 277 S.W.2d):
>
> > '* * *, the intent to deceive is the gravamen of the offense in all cases of
> > this character.'
>
> No such intention was established. The opinion goes on to say (page 34 of 277
> S.W.2d):
>
> > 'Therefore, the greater consideration should be given to the intent with
> > which the name is used, the manner in which it is used, and whether the
> > public is deceived or confused by the use of the name to the detriment of
> > the business offended.'

*Id.* at 139 (quoting *Kay Jewelry*, 277 S.W.2d at 33–34).

Accordingly, reading in context the *Covington* court's statement that unfair competition

includes "injuring the plaintiff by taking his business or impairing his good will," this refers to

situations in which the similarity between two parties' products or services, or the names thereof, leads to customer confusion or deception which then causes loss of business or goodwill by the senior user. Accordingly, the customer deception PCM alleges as a result of UEW, KEW, and Brightmore's alleged unlawful and unlicensed business practices, that is, that customers are deceived because they are unaware that Defendants are operating unlawfully, is not the sort of deception necessary to make out a claim for unfair competition. Rather, as the Kentucky Court of Appeals clarified in 2007, the crucial inquiry in an unfair competition case is whether customers are likely to be deceived or confused "as to the *source or origin* of goods" or services. *Kenney*, 269 S.W.3d at 871 (quoting 54A Am. Jur. 2d *Monopolies, Restraints of Trade, and Unfair Trade Practices* § 1107 (1996)). PCM makes no allegations that this sort of deception exists in this case, nor that any such deception led to its loss of business or impairment of goodwill. Accordingly, *Covington* does not support PCM's claim of unfair competition.

PCM cites to only one case aside from *Covington* which it claims supports its theory that the tort of unfair competition applies to competitors with an alleged unfair advantage in the marketplace: *McCormack v. Cole*, 97 S.W.2d 33 (Ky. Ct. App. 1936). In *McCormack*, the licensed operator of a taxi service sought to enjoin an unlicensed competitor from transporting passengers unless the competitor, too, obtained the appropriate license. *Id.* at 34. The competitor conceded noncompliance with Kentucky's licensure statute, but denied that it had engaged in the business of taxiing. *Id.* The trial court entered judgment against the operator without explanation. *Id.* However, in the light of overwhelming evidence that the competitor had been "regularly engaged" in the "unlawful enterprise" alleged, the Kentucky Court of Appeals, (then Kentucky's highest court), reversed. *Id.* at 34–35. It held injunctive relief to be appropriate. *Id.* at 35.

PCM reads *McCormack* as recognizing a cause of action whereby a competitor can bring suit to prevent an unlicensed competitor from participating in the marketplace. [DN 177 at 10–12.] However, as the Court pointed out in its Order denying PCM's motion for a preliminary injunction, the problem with PCM's interpretation is that the operator in *McCormack* had an explicit, statutory cause of action against the competitor. *McCormack*, 97 S.W.2d at 34 (quoting Ky. Stat. § 2739j-92 (Supp. 1933)). In detail, section 2739j-92 of Carroll's Kentucky Statutes expressly provided that:

> Any common carrier, contract carrier [taxi drivers] or any other person, firm or corporation may, at the instance of the Commission or of any person having an interest in the subject-matter, be enjoined by the courts of this State from any violation of the provisions of this Act, or of any order, rule, regulation or requirement of the Commission.

*Id.* (alteration in original) (quoting Ky. Stat. § 2739j-92 (Supp. 1933)). Section 2739j-92, the Court of Appeals explained, supplied the operator in *McCormack* with "complete authority for the maintenance of [its] action to obtain" injunctive relief against the competitor. *Id.* at 34–35. *McCormack*, then, cannot be read as broadly as PCM has argued.

PCM next argues that the *McCormack* court also held, before addressing the statute giving the plaintiff a private right of action to sue, that "injunctive relief may be obtained by one who sustains property damage because of the violation." *Id.* at 34. According to PCM, "[w]holly apart from the statute, the court concluded the unlicensed common carrier could be enjoined for unfair competition due to a violation of criminal laws," and that based on that holding, "PCM's unfair competition claim is plausible." [DN 177 at 11.]

However, the *McCormack* court specifically held that a plaintiff can seek injunctive relief for property damage sustained as a result of "the violation of the *criminal laws* of the commonwealth." *McCormack*, 97 S.W.2d at 34 (emphasis added). In this case, by contrast, PCM

has not alleged that UEW, KEW, and Brighmore are violating any criminal laws. Accordingly, *McCormick* does not support a finding that PCM has a private right of action to sue Defendants for failing to comply with civil licensure laws.

Finally, PCM has not cited a single Kentucky case, and the Court can find none, in which a claim of unfair competition has been successful against a competitor who allegedly has an unfair advantage in the marketplace. Rather, as the Court explained above, the only cases in which unfair competition claims have been successful in Kentucky is in the realm of trademarks. *See Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 789 (W.D. Ky. 2001) (Heyburn, J.) ("Kentucky has only recognized the claim of unfair competition in the realm of trademarks."); *Cmty. Ties of Am., Inc. v. NDT Care Servs., LLC*, No. 3:12-CV-00429, 2015 WL 520960, at *19 (W.D. Ky. Feb. 9, 2015) (Simpson, J.) (same). PCM's reliance on *Covington* and *McCormick* do not persuade the Court otherwise. In sum, because PCM has not pled facts suggesting that it has lost business or goodwill due to customer confusion or deception as to the source of health care services, its claim for unfair competition against Defendants fails. Therefore, Defendants' motion to dismiss this claim is granted.

### B. Violations of Ky. Rev. Stat. §§ 216B.010 to .990

Next, UEW, KEW, and Brightmore move to dismiss PMC's claim under Chapter 216B of the Kentucky Revised Statutes. Specifically, PCM alleges that "Brightmore, KEW and UEW have established a health facility and/or are providing health services as defined in KRS Chapter 216B without proper licensure or a Certificate of Need." [DN 148 at 12.] Chapter 216B outlines various requirements for health facilities in Kentucky, including, for example, the requirement that no person may establish a health facility "without first obtaining a certificate of need." Ky. Rev. Stat. Ann. § 216B.061(1)(a). Additionally, § 216B.105 provides, in part, that, "no person

shall operate any health facility in this Commonwealth without first obtaining a license issued by the [C]abinet [for Health and Family Services]." Ky. Rev. Stat. Ann § 216B.105(1).

PCM relies on Ky. Rev. Stat. § 446.070 as the basis for its claims against Defendants for the alleged violations of Chapter 216B. [*See* DN 177 at 13–15.] Section 446.070 creates a private right of action for any person injured on account of a statutory violation so long as two conditions are satisfied. *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534 (Ky. 2011); *accord Ezell v. Christian Cty.*, 245 F.3d 853, 856 (6th Cir. 2001). First, the person injured must belong to the class of persons intended to be protected by the statute. *Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 99–100 (Ky. 2000). Second, the injury suffered must be of the type that the statute was designed to prevent. *McCarty v. Covol Fuels No. 2, LLC*, 476 S.W.3d 224, 229 (Ky. 2015). PCM cannot satisfy either requirement.

### 1. Class of Persons Intended to Be Protected

As the Court explained in its prior opinion denying PCM's motion for a preliminary injunction, even assuming PCM is correct that UEW, KEW, and Brightmore are acting in violation of Chapter 216B, PCM is not a member of the class of persons Chapter 216B is intended to protect. Ky. Rev. Stat. § 216B.010 states the General Assembly's purpose for licensing home health agencies. It reads, in pertinent part, "the licensure of health facilities and health services is a means to insure that the citizens of this Commonwealth will have safe, adequate, and efficient medical care." Ky. Rev. Stat. § 216B.010. "The statute's end goal in implementing its licensure provisions, then, is to protect *users* of Kentucky health care facilities." *Vanhook v. Somerset Health Facilities, LP*, 67 F. Supp. 3d 810, 823 (E.D. Ky. 2014) (emphasis added); *see also United States ex rel. Doe v. Jan-Care Ambulance Serv.*, 187 F. Supp. 3d 786, 794–95 (E.D. Ky. 2016) (same). PCM is not a user of health facilities or health services.

It is a provider of them. Nothing in chapter 216B, including the General Assembly's statement in section 216B.010, seems to be intended to protect providers of those services. *See Vanhook*, 67 F. Supp. 3d at 823 (finding that resident of a long-term care facility was in the class of persons intended to be protected).

PCM, however, relies on the following excerpt from *Vanhook*:

> While the Chapter's end goal may be to protect the Commonwealth's citizens and users of health care facilities, *see* KRS § 216B.010 (first sentence), it principally aims to regulate the proliferation of health care facilities and their services so as to "improve the quality and increase access to health-care facilities, services, and providers, and to create a cost-efficient health-care delivery system for the citizens of the Commonwealth." KRS § 216B.010. In essence, the statute requires certificates of need in order to prevent health care facilities from amassing new services and equipment—the cost of which would ultimately be borne by patients, precluding access to health care for some Kentucky citizens. *See id.* The type of harm the statute aims to prevent, then, is economic in nature. Vanhook has not alleged any injury regarding her access to health care or economic harm. Rather, Ms. Vanhook suffered a physical harm: the alleged "accelerated deterioration" of her health while in the care of Cumberland. [Compl., R. 1–2 at ¶ 20.] Thus, he cannot state a negligence per se claim for violation of KRS Chapter 216B, and this claim must be dismissed.

*Id.* at 824. PCM relies on this passage for the argument that it is within the class of persons intended to be protected because, "[a]s a licensed home health care facility, PCM undoubtedly has an interest in seeking redress for injuries caused by the unlawful proliferation of unlicensed home health care facilities like UEW and Brightmore, which impacts *both* the public *and* lawful healthcare providers like PCM." [DN 177 at 13.]

PCM's interpretation of *Vanhook* is incorrect for two reasons. First, the above passage to which PCM refers pertains the *Vanhook* court's discussion of the second requirement for a negligence per se claim under § 446.070, that is, the injury suffered must be of the type that the statute was designed to prevent. *Vanhook*, 67 F. Supp. 3d at 824 ("Vanhook . . . has not shown that the harm that Ms. Vanhook suffered was an event that the statute was designed to prevent.)

With regard to the first requirement, the *Vanhook* court unambiguously agreed that the plaintiff, a patient at a long-term health care facility, was "among the class of persons that Chapter 216B was designed to protect . . . *The statute's end goal in implementing its licensure provisions . . . is to protect users of Kentucky health care facilities*. Vanhook's Complaint alleges that Ms. Vanhook was a resident of a long-term care facility. Construing the Chapter's goals broadly, then, she was within the class of persons that these licensure standards were designed to protect." *Id.* at 823 (emphasis added) (internal citations omitted). Accordingly, the *Vanhook* court, like this Court, found that Chapter 216B was designed to protect users of Kentucky health care facilities. *Id.*

Second, it is clear that, in stating that "[t]he type of harm the statute aims to prevent . . . is economic in nature," the *Vanhook* court was still referring to economic harm to *users* of health care services and facilities. Citing § 216B.010, the *Vanhook* court explained that, "[i]n essence, the statute requires certificates of need in order to prevent health care facilities from amassing new services and equipment—*the cost of which would ultimately be borne by patients, precluding access to health care for some Kentucky citizens*." *Id.* The economic harm the court discussed in *Vanhook* involved the increase in health care costs likely to result from the proliferation of health care facilities, which would prevent Kentucky *citizens*, i.e. users of health care facilities, from accessing such costly services. *See id.* Indeed, § 216B.010 itself states that

> it is the purpose of this chapter to fully authorize and empower the Cabinet for Health and Family Services to perform any certificate-of-need function and other statutory functions necessary to improve the quality and increase access to health-care facilities, services, and providers, and to create a cost-efficient health-care delivery system for the citizens of the Commonwealth.

Ky. Rev. Stat. Ann. § 216B.010. There is no indication whatsoever from this statute that Chapter 216B was intended to protect health care facilities. Accordingly, PCM is not within this class of persons intended to be protected by Chapter 216B.

### 2. Type of Injury the Statute was Designed to Prevent

For many of the same reasons PCM is not within the class of persons sought to be protected, the type of injury PCM alleges it has suffered is also not the type of injury Chapter 216B was designed to prevent. As the Court noted above, Chapter 216B is intended to prevent increased costs, economic harm, and a lack of access to health care services by Kentucky citizens. *See* Ky. Rev. Stat. Ann. § 216B.010; *Vanhook*, 67 F. Supp. 3d at 824. PCM has not alleged that it has suffered any of these sorts of injuries, and therefore the injury it alleges is not the type Chapter 216B was intended to prevent. Because PCM satisfies neither of the requirements to bring a negligence per se action under KRS § 446.070, its claim against Defendants for violations of Chapter 216B must be dismissed.

### C. Tortious Interference With a Contract or Intentional Interference With a Prospective Business Relationship

Next, Defendants move for dismissal of PCM's third claim of tortious interference with a contract and/or intentional interference with a prospective business relationship. In its complaint, PCM alleges that it "has valid, existing and enforceable contracts with its patient-clients to provide home health care services, as well as a reasonable expectation that it would establish new patient-client relationships with patients needing home health care services in PCM's service area." [DN 148 at 13, ¶ 80.] PCM next alleges that Defendants were aware of those contracts or expectancies and "intended to engage in, have engaged in and continue to engage in improper and unlawful tactics to interfere with PCM's relationships with current and prospective patient-clients." [*Id.* at 13, ¶¶ 81–82.]

Additionally, PCM contends that Defendants have "offered free, unrelated services" in an attempt to "induce PCM's patient-clients to switch providers and/or interfere with PCM's ability to establish or maintain a relationship with such patient-clients," in violation of federal law. [*Id.* at 13, ¶ 83.] Finally, PCM alleges that "Defendants also formed Brightmore to further UEW's and KEW's prior, unlawful interference with PCM's relationships with its patient-clients, as well as to unlawfully and tortiously interfere with PCM's prospective patient-client relationships." [*Id.* at 14, ¶ 84.] According to its amended complaint, "PCM has lost and is threatened with losing valuable and significant services contracts with its patient-clients and prospective patient-clients," in addition to "lost profits." [*Id.* at 14, ¶ 86, ¶ 90.]

The Court will address these allegations as they are relevant to PCM's claims of tortious interference with a contract and intentional interference with a prospective business relationship in turn.

### 1. Tortious Interference with a Contract

In Kentucky, a claim for tortious interference with a contract requires (1) the existence of a contract, (2) knowledge thereof, (3) the intent to cause a breach, (4) and conduct which, in fact, caused a breach, (5) that resulted in damages, (6) in the absence of any privilege or justification to excuse that conduct. *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5–6 (Ky. Ct. App. 2012); *accord Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 618–19 (W.D. Ky. 2009), *aff'd sub nom. Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291 (6th Cir. 2011).

In their motion to dismiss, Defendants first contend that "PCM has failed to even allege any contract has been breached, and has instead alleged only that it has experienced 'loss of competitive position in the marketplace.'" [DN 155 at 15 (quoting DN 148 at 14, ¶ 90).] Additionally, Defendants argue that, "since the contracts PCM has with its patient-clients are

17

terminable at will, PCM 'has no legal assurance of them,' and they cannot sustain the tort" of tortious interference with a contract. [*Id.*] Finally, Defendants contend that, because UEW and Brightmore are competitors of PCM, PCM must allege "heightened unlawful means," by which Defendants induced a breach of contract, which PCM has failed to do. [*Id.* at 20.]

In response, PCM argues that, though it did not use the word "breach" in its amended complaint, its allegations are sufficient to create a plausible inference of breach. [DN 177 at 17.] For instance, in its amended complaint, PCM alleges that Defendants engaged in conduct designed to "interfere with PCM's relationships with current . . . clients," that Defendants attempted "[t]o induce PCM's patient-clients to switch providers," and that "PCM has lost . . . valuable and significant services contracts with its patient-clients." [DN 148 at 13–14, ¶¶ 82–83, 86.] Next, PCM does not dispute that its patients' contracts are terminable at will, but instead argues that such contracts can be the subject of a claim of tortious interference with a contract. In support of this argument, PCM cites *Tractor & Farm Supply, Inc. v. Ford New Holland, Inc.*, in which the court stated that "[g]enerally, recruitment of at-will employees cannot be the basis of a claim of tortious interference with contract," however, this "'competitor privilege' may be defeated . . . if the actor employed improper means or evinced improper motivation when recruiting at-will employees." 898 F. Supp. 1198, 1206 (W.D. Ky. 1995) (citing *Restaurant Associates Industries, Inc. v. Anheuser Busch, Inc.,* 422 F.Supp. 1105 (S.D.N.Y. 1976)).

However, the "improper means" and "improper motivation" language used by the court in *Tractor & Farm Supply* in its discussion of terminable at will contracts most closely fits with an action for tortious interference with *prospective* contractual relations, a claim which PCM also brings here. Restatement (Second) of Torts § 766, which Kentucky courts have adopted, *see Atmos Energy Corp. v. Honeycutt*, No. 2011-CA-000601-MR, 2013 WL 285397, at *14 (Ky. Ct.

App. Jan. 25, 2013) (citing *Carmichael-Lynch-Nolan Advert. Agency, Inc. v. Bennett & Assocs., Inc.*, 561 S.W.2d 99, 102 (Ky. Ct. App. 1977)), convinces the Court of this conclusion. Section 766 addresses the "intentional interference with performance of contract by third person." Restatement (Second) of Torts § 766 (1979). The comments to § 766, however, address the section's applicability to "contracts terminable at will." Specifically, Comment (g) states that "[o]ne's interest in a contract terminable at will is primarily an interest in *future* relations between the parties, and he has no legal assurance of them. For this reason, an interference with this interest is closely analogous to interference with *prospective* contractual relations. (See § 766B)." Restatement (Second) of Torts § 766 (1979). Indeed, Kentucky courts have likewise adopted Restatement § 766B, which addresses "intentional interference with prospective contractual relation." Restatement (Second) of Torts § 766B (1979). *See Nat'l Collegiate Athletic Ass'n By & Through Bellarmine Coll. v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988) ("Upon examination of our decisions, we conclude that the foregoing sections [766B, 767, and 773] of the *Restatement* fairly reflect the prevailing law of Kentucky.").

With regard to claims of interference with prospective business relationships, Kentucky "law is clear that a party may not recover under the theory presented in the absence of proof that the opposing party 'improperly' interfered with his prospective contractual relation." *Id.* at 858; *see also* Restatement (Second) of Torts § 766B (1979) (Specifically discussing the requirement that one "intentionally and improperly interfere[ ] with another's prospective contractual relation."). The *Tractor & Supply* court additionally mentioned the "competitor privilege," which, as defined in Restatement § 768, specifically pertains to propriety of interference with the *prospective* contractual or business relations of another by a *competitor*. Restatement (Second) of Torts § 768 (1979), cmt. (a). Based on the foregoing authorities, the Court finds that the *Tractor*

& *Supply* court's discussion of "improper means" and "improper motivation" with regard to interference with terminable at will contracts refers to a claim for interference with a *prospective* contract or business relationship rather than interference with an *existing* contract.

This conclusion is commonsense considering the fact that, to cause the breach of an *existing* contract, which is required to succeed on a claim for tortious interference with a contract under Kentucky law, *see Snow Pallet*, 367 S.W.3d at 5–6, the contract must be one *able* to be breached. Because, as PCM does not dispute, its agreements between it and its patient-clients are terminable at will, PCM cannot point to any specific clause in those agreements that would be breached by virtue of a patient ending its relationship with PCM and entering into an agreement with a different health services provider such as UEW. *See Shane v. Bunzl Distribution USA, Inc.*, 200 F. App'x 397, 401 (6th Cir. 2006) ("Although Shane alleged that Bunzl had breached its contract 'by improperly terminating that contract,' . . . the district court found that Shane had not alleged in his complaint that these were required by the terms of Shane's contract with Bunzl. In essence, the district court found that Shane had alleged a breach of contract without alleging the existence of the contractual terms that required Bunzl to perform those acts . . . Upon review, we conclude that the district court's reasoning in dismissing Shane's breach-of-contract claims in Counts I and II was sound."); Restatement (Second) of Torts § 768 (1979), cmt. (i) ("If the third person is free to terminate his contractual relation with the plaintiff when he chooses . . . any interference with it that induces its termination is primarily an interference with the *future* relation between the parties . . . As for the future hopes he has no legal right but only an *expectancy*; and when the contract is terminated by the choice of the third person *there is no breach of it*.") (emphasis added); Restatement (Second) of Torts § 768 (1979) (Explaining that a

competitor "causing a breach of an existing contract" can constitute "an improper interference if the contract is *not* terminable at will.").

Accordingly, though PCM alleges that it has lost contracts with certain patient-clients, it does not allege that those contracts were *breached*. Therefore, PCM's allegations in this regard are properly directed toward a claim for tortious interference with a *prospective* contract or business relation, which the Court will address below. Defendants' motion to dismiss PCM's claim of intentional interference with a contract, therefore, is granted.

## 2. Intentional Interference with a Prospective Business Relationship

An action for intentional interference with a prospective business relationship does not require a breach of contract, but instead requires (1) the existence of a valid business relationship or its expectancy, (2) knowledge thereof, (3) an intentional act of interference, (4) taken with an improper motive, (5) which caused (6) special damages. *Halle v. Banner Indus. of N.E., Inc.*, 453 S.W.3d 179, 184 (Ky. Ct. App. 2014); *accord Griffin v. Jones*, 170 F. Supp. 3d 956, 967 (W.D. Ky. 2016). Even assuming, for argument's sake, that PCM can satisfy the remaining elements for a claim of intentional interference with a prospective business relationship, it cannot satisfy the fourth element. Specifically, PCM has failed to allege a sufficient "improper motive" on behalf of Defendants.

The Kentucky Supreme Court has explained that "a party may not recover under the theory presented in the absence of proof that the opposing party 'improperly' interfered with his prospective contractual relation." *Hornung*, 754 S.W.2d at 858. To demonstrate improper interference, "a party seeking recovery must show malice or some significantly wrongful conduct." *Id.* at 859. "[M]alice may be inferred in an interference action by proof of lack of justification." *Id.* The Supreme Court in *Hornung* likewise adopted Restatement (Second) of

Torts Sections 766B, 767, and 773 as "fairly reflect[ing] the prevailing law of Kentucky." *Id.* at 857.

Kentucky courts have explained that "significantly wrongful conduct" for purposes of interference with prospective business relations "includes fraudulent misrepresentation, deceit, and coercion. *Alph C. Kaufman, Inc. v. Cornerstone Indus. Corp.*, 540 S.W.3d 803, 820 (Ky. Ct. App. 2017), *reh'g denied* (June 2, 2017), *review denied* (Mar. 14, 2018) (quoting *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 487 (Ky. 1991) ("Under Kentucky law, tort liability exists for the interference with a known contractual relationship, if the interference is malicious or without justification, or is accomplished by some unlawful means such as fraud, deceit, or coercion . . . [and] breach of a fiduciary duty is equivalent to fraud."). Additionally, "[t]o determine whether the interference is improper, [Restatement] Section 767 sets forth seven factors to be considered," *Hornung*, 754 S.W.2d at 858, including:

> [ (1) ] the nature of the actor's conduct, [ (2) ] the actor's motive, [ (3) ] the interest of the other with which the actor's conduct interferes, [ (4) ] the interests sought to be advanced by the actor, [ (5) ] the social interests in protecting the freedom of action of the actor and the contractual interests of the other, [ (6) ] the proximity or remoteness of the actor's conduct to the interference and [ (7) ] the relations between the parties.

*Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 534 (Ky. Ct. App. 2005) (quoting Restatement (Second) of Torts § 767); *accord Ventas II*, 647 F.3d at 306; *EAT BBQ LLC v. Walters*, 47 F. Supp. 3d 521, 533–34 (E.D. Ky. 2014).

The Sixth Circuit has also predicted that Kentucky courts would apply Restatement § 768, which "holds plaintiffs to a more exacting standard" for "a tortious interference claim between competitors." *Ventas*, 647 F.3d at 306, 309–10. "Section 768 makes clear that 'competition is not an improper basis for interference.'" *Id.* at 306 (quoting Restatement (Second) of Torts § 768, cmt. (a)). Therefore, that section provides, in relevant part:

**§ 768. Competition as Proper or Improper Interference**

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will *does not interfere improperly* with the other's relation if

> (a) the relation concerns a matter involved in the competition between the actor and the other and

> (b) the actor does not employ *wrongful means* and

> (c) his action does not create or continue an unlawful restraint of trade and

> (d) his purpose is at least in part to advance his interest in competing with the other.

Restatement (Second) of Torts § 768 (1979) (emphasis added). Because PCM and Defendants are competitors, the primary concern in this case is whether PCM has alleged that Defendants intentionally interfered with its prospective business relationships through "*wrongful means*." *Id.*

The Sixth Circuit has held that, because "Section 768 does not define 'wrongful means,' and in fact places no limitation whatsoever on the factors that a jury might consider to determine whether the interference of a competitor was wrongful," it is proper to "look[ ] to § 767, as many other courts have done, to illuminate the meaning of 'wrongful' conduct under § 768." *Ventas*, 647 F.3d at 310. For instance, in *Ventas*, the Sixth Circuit affirmed the district court's blending of sections 767 and 768 when instructing the jury using the following language:

> Ventas and HCP were business competitors generally, and were competing here to acquire Sunrise [ ]. *Improper interference, as referenced in element number three, has a special meaning among competitors*. In these circumstances then, the only way to find in favor of Ventas is to find that HCP employed—I put it in quotes because it's a defined term—"significantly wrongful means" to interfere with Ventas'[ ] acquisition of Sunrise [ ] at $15 per unit.

> For purposes of this instruction, *"significantly wrongful means" includes conduct such as fraudulent misrepresentation, deceit and coercion*. Among other things, you may consider the parties' conduct, motive and the circumstances of the

transaction to illuminate whether HCP's conduct amounts to significantly wrongful means.

*Ventas*, 647 F.3d at 307–08 (emphasis added). Moreover, the comments to Restatement § 768 explain that "physical violence, fraud, civil suits and criminal prosecutions, are all wrongful [means] in the situation covered by this Section." Restatement (Second) of Torts § 768 cmt. (e) (1979).

PCM alleges, in essence, four possible "wrongful means" that Defendants used to intentionally interfere with its prospective business relations, including that: 1) Defendants operated without the correct license, 2) Defendants improperly classified certain employees as independent contractors, 3) Defendants formed Brightmore for the express purpose of continuing to provide unauthorized health care services in Kentucky, and that 4) Defendants attempted to attract PCM patients by offering services unrelated to healthcare in violation of the federal Anti-Kickback statute. [DN 148 at 7, 10, 13–14.]

None of these allegations, however, rise to the level of fraudulent misrepresentation, deceit, coercion, physical violence, civil suits, criminal prosecutions, or any other conduct analogous to these examples of "wrongful means" under § 768.[2] Specifically, the first three allegations are essentially the same as those the Court rejected above when addressing PCM's claim of unfair competition. In order to sufficiently allege wrongful and improper means for intentional interference with prospective business relations purposes, the conduct alleged must be specifically wrongful *to the plaintiff*. For instance, in *Raheel Foods, LLC v. Yum! Brands, Inc.*,

---

[2] In its sur-reply, PCM argues that "wrongful means" is not limited to means such as fraud and deceit. [DN 190-1 at 4 (citing *Raheel*, 2017 WL 217751, at *5).] However, PCM does not address or attempt to distinguish Restatement § 768, which provides examples of wrongful means for suits between competitors such as "physical violence, fraud, civil suits and criminal prosecutions." Restatement (Second) of Torts § 768 cmt. (e) (1979). This language, in combination with the Kentucky cases discussed above, demonstrates that to state a claim for intentional interference with a prospective contractual relation under § 768, PCM must plead significantly wrongful means on par with fraud, deceit, coercion, physical violence, or threats of litigation. PCM has not done so here.

our sister district court found that the plaintiff stated a claim for intentional interference with prospective business relations when the plaintiff, Raheel, alleged that defendant Yum! Brands wrongfully withdrew its approval for Raheel to sell its franchises to a third party, J.A., only to later sell seventy of its own corporate-owned stores to that third party at a substantial discount. 2017 WL 217751, at *2, *5 (Stivers, J.).

In *Ventas*, both parties participated in an action to acquire a business, Sunrise RET. *Ventas*, 635 F. Supp. 2d at 618 (Heyburn, J.). At the summary judgment stage, the district court found that jury issues existed as to the plaintiff's tortious interference with prospective relations claim when the plaintiff, Ventas, alleged that defendant HCP had wrongfully released a press release containing fraudulent misstatements regarding how much money it would pay to acquire Sunrise RET. Ultimately, Ventas claimed that these misstatements led it to raise its *own* bid to acquire Sunrise RET, and that it suffered damages as a result of the increase in cost. *Id.* at 622–23.

Finally, in *Alph C. Kaufman, Inc. v. Cornerstone Industries Corporation*, the Kentucky Court of Appeals upheld the jury verdict finding a company, "ACK," liable for intentional interference with prospective business relations when "Cornerstone presented evidence that [ACK] intentionally sought to lure Roby [an employee] from Cornerstone to ACK, to take advantage of Roby's knowledge of Cornerstone's clients and potential clients, specifically to position ACK to compete with Cornerstone's business." 540 S.W.3d at 820. Additionally, "[t]here was [ ] evidence that Roby and [ACK] purposefully conspired to misappropriate and divert business opportunities from Cornerstone to ACK. Together, Kaufman and Roby achieved this end by misappropriating Cornerstone bid documents and then submitting competing, lower bids to multiple potential Cornerstone clients." *Id.*

Here, unlike in *Raheel, Ventas*, or *Alph*, PCM has not alleged, at least in its first three allegations, that Defendants engaged in any conduct that was specifically wrongful *to PCM* that was intended to interfere with PCM's prospective business relations. Rather, PCM simply claims, as it did with its unfair competition claim, that Defendants have done things that give them an unfair advantage in the market as a whole. This is insufficient; to state a claim for intentional interference with prospective business relations, PCM must allege wrongful means specifically aimed at PCM.

The only allegation PCM makes that *is* specific to it is that Defendants offered its client-patients unrelated services, such as free lawn care, to persuade those patients to switch providers from PCM to Defendants. [DN 148 at 7, ¶ 32.] According to PCM, such offers "violate the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)." [*Id.* at 7, ¶ 33.] This allegation is also insufficient, however, because 42 U.S.C. § 1320a-7b(b) does not prohibit the conduct PCM alleges Defendants have engaged in. The Anti-Kickback statute, a criminal law, is "designed to protect against fraudulent overutilization of government-reimbursed healthcare services" like Medicare and Medicaid. *U.S. ex rel. Villafane v. Solinger*, 543 F. Supp. 2d 678, 682–83 (W.D. Ky. 2008). Section 1320a-7b(b) provides, in relevant part:

**(b) Illegal remunerations**

**(1)** whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--

**(A)** in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

**(B)** in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

**(2)** whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

> **(A)** to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> **(B)** to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C.A. § 1320a-7b(b).

In essence, § 1320a-7b(b) prohibits situations in which health care providers give or receive kickbacks in exchange for referring patients to other providers who may provide services that are reimbursable by a federal program such as Medicare or Medicaid. That is not what PCM alleges here. Rather, PCM alleges that Defendants are "soliciting prospective patients with illegal kickbacks" such as lawn care. [DN 177 at 18.] This is not conduct that is prohibited under § 1320a-7b(b), as PCM claims it is. In other words, the factual allegations in PCM's amended complaint do not allege a violation of this § 1320a-7b(b). Accordingly, a violation of that statute cannot form the basis of the "wrongful means" PCM must allege in order to state a claim for intentional interference with prospective business relations.

In sum, PCM has failed to allege the requisite fraudulent misrepresentation, deceit, coercion, physical violence, civil suits, criminal prosecutions, or other conduct analogous to this sort of conduct sufficient to allege "wrongful means" as required by Restatement § 768. It has also failed to allege any wrongful conduct that was targeted specifically toward it by Defendants.

Because PCM has failed to sufficiently allege that Defendants' alleged interference was "improper," its claim for intentional interference with s prospective business relationship must be dismissed.

### D. Civil Conspiracy

PCM's final claim is for civil conspiracy. Civil conspiracy is "defined as 'a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means.'" *Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008) (quoting *Smith v. Bd. of Educ. of Ludlow*, 264 Ky. 150, 94 S.W.2d 321, 325 (1936)). However, "civil conspiracy is not a free-standing claim; rather, it merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort." *Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V.*, No. 2008-CA-002389-MR, 2010 WL 2696278, at *13 (Ky. Ct. App. July 9, 2010). It follows logically, therefore, that to succeed on such a claim, a plaintiff must prove that the defendants "acted tortiously." *Peoples Bank*, 277 S.W.3d at 261. Because the Court has found that PCM has failed to state a claim for unfair competition, violations of Ky. Rev. Stat. §§ 216B.010 to .990, tortious interference with a contract, and intentional interference with a prospective business relationship, its claim for civil conspiracy to commit those torts also fails. Accordingly, this claim is dismissed.[3]

CONCLUSION

For the reasons discussed in detail above, Defendants' motion to dismiss for failure to state a claim, [DN 154], is **GRANTED**. A Telephonic Status Conference is **SET** for **May 11,**

---

[3] Defendants' final argument in their motion to dismiss is that the Court does not have personal jurisdiction over the Individual Defendants, John Falls, Travis Shumway, Chad Shumway, and Nicholas Bame. [DN 155 at 23.] However, because the Court has found that all of PCM's claims against all Defendants must be dismissed for failure to state a claim, the Court need not reach this argument.

**2018 at 11:30 a.m. Central Time**. Counsel for the parties shall connect to the conference by dialing 1-877-848-7030 and entering the Access Code, 2523122#, and then when prompted press # again to join the call.

      **IT IS SO ORDERED**.

Date:

cc:     Counsel